**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| Robert Poandl, | : | Case No.  1:12-cr-00119-1 |
| | : | (1:16-cv-00286) |
| Petitioner, | : | |
| | : | |
| v. | : | Judge Michael R. Barrett |
| | : | |
| United States of America, | : | |
| | : | |
| Respondent. | : | |

**OPINION AND ORDER**

This matter is before the Court on Petitioner Robert Poandl's Motion to Vacate under 28 U.S.C. § 2255 and Declarations in Support of his Motion to Vacate.  (Docs. 100, 106-1, 106-2, 106-3).  The United States has filed a Memorandum in Opposition (Doc. 112), to which Petitioner has replied (Doc. 113).

**I.    Prior Proceedings**

In 2012, a jury found Petitioner guilty of transporting a minor in interstate commerce with the intent to engage in sexual activity in violation of 18 U.S.C. § 2423. The charge stems from a trip Petitioner allegedly took on August 3, 1991.  At the time, Petitioner was a Catholic priest, and he was travelling from Cincinnati, Ohio to Spencer, West Virginia to cover mass for another priest, Paul Fredette.  David Harper, the alleged victim, accompanied him on that trip.  David Harper was then ten years old.  At trial, David's mother, Barbara Harper, explained the relationship between the Harper family and Petitioner, and how it came about that David accompanied Petitioner on the trip:

> Barbara Harper, David Harper's mother, testified that she and her husband, Mike, moved to Cincinnati in 1988 with their four children: Chris,

1

Joe, David, and Amanda. Devout Catholics, she and Mike became involved in Marriage Encounters, a weekend retreat program designed to strengthen marriages. Each Marriage Encounters group featured three couples and a priest. Poandl was the priest for the Harpers's Marriage Encounters group.

In November 1990, Mike Harper lost his job. Because of this, during the spring and summer of 1991, Poandl came to their house frequently, often unannounced. When he came, he would often bring food, and once he gave the couple money to pay bills.

Although she could not remember the "exact date," Barbara believed that sometime "around August" of 1991, Poandl came by the house and told her that he had to cover a mass in West Virginia. She testified that Poandl arrived at her house before dinner, probably around 4:30 or 5:00 in the afternoon. Poandl asked Barbara if one of her sons could accompany him on the trip to keep him company and to help him stay awake at the wheel. She asked David, then ten years old, if he would be willing to go, and he initially refused. Barbara responded, "Father Bob has been so good to us, you know. Please go with him." Barbara packed David an overnight bag and watched as Poandl and her son left. She testified that they left in a blue-gray sedan.

When David returned the next morning, Barbara noticed that he did not look well. She asked him if he was all right, to which David replied that he felt sick because Poandl had given him cornflakes with lemonade for breakfast. He asked if he ever had to go anywhere with Poandl again; Barbara answered that he did not. He then ran upstairs, clearly upset. Weeks later, Poandl came by the house and told Barbara that he would not be visiting the Harpers's house anymore because none of her sons showed promise to be priests. It is uncontested that Marriage Encounters is not a recruitment program for priests.

*United States v. Poandl*, 612 F. App'x 356, 358 (6th Cir. 2015).

At trial, David Harper testified that:

Poandl took him on a trip in the late summer of 1991, around August, when he was ten-years-old. They left late in the afternoon or early evening, "probably six or five." Poandl drove a sedan that David remembered him driving on other occasions. When the two arrived in West Virginia, they spent the night in the rectory at the church. David awoke at some point in the night to find that Poandl had entered his bed and had his hand in David's pants, fondling David's genitalia. When David asked what he was doing, Poandl replied that he was checking to see if David was wearing underwear. David fell asleep again, only to be

> awakened later by Poandl sodomizing him. David cried out, "What are you doing to me?" to which Poandl replied, "We're having sex." After Poandl finished, he seemed extremely remorseful and kept repeating, "I did a bad thing. I did a bad thing." After regaining composure, he said to David, "You sinned, and I sinned, and we need to pray to God for forgiveness," at which point they prayed together. David remembered semen running down his leg, to the point that Poandl told him that he should go clean himself up.
>
> The next day, Poandl told David repeatedly to keep to himself what had happened.

*Id.* at 359-360. David Harper testified that he did not tell anyone what had happened until 2009. *Id.* at 360.

Other witnesses at trial included Lauren Cope, David Harper's fiancée; Joseph W. Harper, David Harper's brother; Karen Fredette, who in August of 1991, was the secretary of the Holy Redeemer Church where Petitioner was covering mass for Paul Fredette; and Larry Handorf, a private investigator hired by the mission where Poandl was based in 1991.

After the jury found Petitioner guilty, this Court held a sentencing hearing and sentenced Petitioner to a prison term of ninety months. This Court denied Petitioner's motion for judgment of acquittal and motion for a new trial. On appeal to the Sixth Circuit Court of Appeals, Petitioner's conviction was affirmed.

## II. <u>Section 2255 Claim</u>

Petitioner asserts that he was denied the effective assistance of counsel in violation of the Sixth Amendment to the United States Constitution. Petitioner's claim can be broken down into eleven subclaims:

a) Counsel failed to object to a substantial quantity of inadmissible, highly prejudicial testimony, and no conceivable strategy explains the failure to object;

3

b) The prosecutor mischaracterized testimony of a key witness, Karen Fredette, and counsel failed to object;

c) The prosecution made defense counsel a percipient witness, and counsel failed to object, seek a corrective instruction, or move to withdraw;

d) Counsel failed to object to an improper and highly prejudicial closing argument;

e) Counsel failed to impeach Karen Fredette for bias despite being on notice that she had become hostile to Petitioner;

f) Counsel made no effort to impeach the alleged victim, David Harper with evidence that Harper attempted to obstruct justice;

g) Counsel failed to investigate and offer evidence that David Harper's drug use and addiction could explain his belief that his allegations were true even if they were not;

h) Counsel failed to enlist expert help in selecting a jury in a high profile case with substantial publicity surrounding priest sexual misconduct generally and the defendant's case in particular;

i) Counsel failed to monitor publicity during trial and to request the Court to assure that jurors were not aware of it;

j) Counsel failed to adequately advise Petitioner of his options with respect to testifying and the circumstances in which the government might offer Federal Rule of Evidence 414 evidence; and failed to investigate the background of Jeffrey Allen Hutchison upon whom the government would have relied to present Rule 414 evidence; and

k) Counsel was unprepared for the sentencing hearing, which is evidence of the inadequacy of counsel across the board.

## III.  **Analysis**

A prisoner seeking relief under 28 U.S.C. § 2255 must allege either "(1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid."  *Mallett v. United States*, 334 F.3d 491, 496-97 (6th Cir. 2003) (quoting *Weinberger v. United States*, 268 F.3d 346, 351 (6th Cir. 2001)).

4

"In reviewing a § 2255 motion in which a factual dispute arises, 'the habeas court must hold an evidentiary hearing to determine the truth of the petitioner's claims.' " *Valentine v. United States*, 488 F.3d 325, 333 (6th Cir. 2007) (quoting *Turner v. United States*, 183 F.3d 474, 477 (6th Cir. 1999)). However, "no hearing is required if the petitioner's allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact." *Id.* (quoting *Arredondo v. United States*, 178 F.3d 778, 782 (6th Cir. 1999)).

A petitioner claiming ineffective assistance of counsel must show that his attorney's performance was so inadequate as to violate his Sixth Amendment rights. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). *Strickland*'s two-part test governs claims of ineffective assistance of counsel. Under the first or "performance" prong, the petitioner must show that his counsel's representation "fell below an objective standard of reasonableness." *Id.* at 688. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within a wide range of professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged conduct might be considered sound trial strategy." *Id.* at 689. Under the second or "prejudice" prong, the petitioner must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* When assessing prejudice, a court "must consider the totality of the evidence before the jury . . . . [A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* at 695. If the

defendant fails to prove either deficiency or prejudice, then the defendant's ineffective assistance of counsel claims fail. *Id.* at 697.

With those standards in mind, the Court now turns to a review of the alleged errors identified by Petitioner.

### A. <u>Failure to object</u>

#### 1. <u>Testimony of Lauren Cope, Barbara Harper, and Joseph Harper</u>

Petitioner argues counsel was ineffective for failing to object to testimony on a number of occasions. First, Petitioner argues that it was error for defense counsel to fail to object to certain testimony of Lauren Cope, Barbara Harper, and Joseph Harper. Petitioner explains that the prosecutor elicited testimony from these witnesses that would establish that David Harper made the same allegations about Petitioner to them as he was making at trial. Petitioner argues that even though these witnesses did not repeat the actual words David Harper said to them, this testimony was inadmissible hearsay. Petitioner explains that David Harper was then called to testify that he made the allegations to his fiancée, mother and brother. Petitioner argues the credibility of David Harper's testimony was therefore bolstered by the earlier testimony of his fiancé, mother and brother.

Under Federal Rule of Evidence 801(d)(1)(B), a prior statement is not hearsay if the statement "is consistent with the declarant's testimony and is offered . . . to rebut and express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying." In *Tome v. United States*, the Court determined a victim's statements made to witnesses were not admissible as a prior consistent statement under Rule 801(d)(1)(B) because the statements were made

6

after her alleged motive to fabricate the testimony arose. 513 U.S. 150, 160-61 115 S.

Ct. 696, 130 L. Ed. 2d 574 (1995).

The Court finds that an analysis under Rule 801(d)(1)(B) is unnecessary. Prior to

trial, counsel for Petitioner filed a Motion in Limine seeking to bar the Government from

introducing statements David Harper made to his girlfriend and parents recounting the

alleged sexual abuse by Petitioner. (Doc. 31). The Government responded to

Petitioner's Motion and stated that it "does not intend to offer any of the identified out-of-

court statements made by DH to his girlfriend or his parents through either DH's

girlfriend or parents." (Doc. 35).

In addition, counsel for Petitioner successfully objected to any statements coming

in during the direct examination of Lauren Cope by the Government:

Q. I'm going to direct your attention to the summer of 2009. Can you tell
the jury what the status of your relationship with David was at that time?

A. We had a falling-out at one time in the summer of 2009.

Q. Can you tell the jury what happened that led to that?

A. We went to dinner, and we were just having a conversation. We had --
we were pretty serious in our relationship, had talked about the future, and
I had brought up that I wanted kids and wanted to have a wedding in a
Catholic church, and he seemed very standoffish.

MR. WENKE: Objection as to what he would say, Your Honor.

THE COURT: Ma'am, you can't testify as to what he said. You may testify
as to his -- as to your observations of his physical appearance and what
you did in response to anything that he would have said, but you can't tell
the jury what he told you.

That's called hearsay, guys, just so you know.

Go ahead.

7

MS. MUNCY: Your Honor, for the record, she did not say he made a statement. She said how he appeared.

THE COURT: I understand that, and I think the question -- I believe the objection was a cautionary one.

MS. MUNCY: Thank you.

(Doc. 60, PAGEID #241-42). The Government then continued to question Lauren Cope about the conversation between David and herself. (Id., PAGEID #242-43). At no time did Cope testify as to any of the statements David made. Instead, Cope described David's appearance and the advice she gave him. (Id., PAGEID #242, 243).

Petitioner points out that the Government argued during closing arguments that David Harper told Lauren Cope about the accusations against Petitioner. (See Doc. 68, PAGEID # 801) ("And ask yourselves just for a minute -- David has this conversation with Lauren, the woman he loves that he's getting ready to marry, maybe, until she brings up the Catholic Church, and then that puts the brakes on everything. He tells her what happened."). However, David Harper himself testified what he told Lauren:

 . . . So the nightmares had gotten worse, and I was getting resolved that I wanted to go and kill him and to make him -- to punish him for what he had done. And then also it just -- it kind of -- it was a Saturday evening. Lauren and I had gone out. We had had dinner, and somehow there was some conversation about getting baptized or something to that effect. I'm like, "There is no way I'm going to raise my kids Catholic."

And I just said it very adamantly, and basically that and the fact that I was -- had -- I was basically at that point planning on killing him.

I wanted to kind of get Lauren away from the situation, so I -- that next morning, I woke up and I broke up with her. And she was crying and went to work, she sent me texts and calling me. And I felt bad about it, and I felt that, you know, I at least owed her the truth to be honest with her.

So after work, we -- I agreed to -- said we can get some dinner and talk about it, went to Chipotle first. I was really welled up with emotion. I

mean, it was -- because I was -- I decided I was going to tell her. It was the first person I ever told.

And I got back -- I said I wanted to go back to my apartment. We went back to my apartment, and I sat on my couch and I related to her what I just related to you.

(Doc. 62, PAGEID # 526-27).

Similarly, Barbara Harper was asked by the Government about conversations she had with David Harper about Petitioner. Counsel for Petitioner objected twice during that testimony. (Doc. 60, PAGEID # 298-99, 299). After the second objection, the following discussion took place during a sidebar conference:

MR. WENKE: This gets back to our motion in limine.

THE COURT: Right.

MR. WENKE: And I know that she's not discussing hearsay. But, at the same time, at some point if David attempts to talk about this, it's still hearsay because just saying, telling ten different people about something doesn't make it more credible. It still has to fit in the exception, and it does --

THE COURT: You mean if she tries to say it. David can testify as to what he said.

MR. WENKE: Well, it's our position it would not unless it fits a recognized exception if --

THE COURT: Why couldn't David say what he said?

MR. WENKE: Because basically it's an attempt using a prior consistent statement to bolster current credibility -- pardon me, not consistent. It does not fit with any hearsay exception. It's our point that if he came in and said, "I told ten different people about this one way or the other," unless I raised the issue it's not admissible as an exception.

THE COURT: We'll have to deal with that at that time, but how can a statement made by the declarant be hearsay?

MR. WENKE: It can be in the sense that, number one, if it doesn't fit an exception to the hearsay doctrine.

THE COURT: But it's not hearsay. But anyway --

MR. WENKE: That's all right. I understand.

THE COURT: What about the -- Christy was asking what was turned over. What's your objection to that?

MR. WENKE: We believe she's going to answer that it was a firearm. And, once again, it's not -- it's a part of our position that this is being used to try to bolster credibility, so it's our position it's not relevant.

THE COURT: The physical act of turning something over, I mean, it's going to be a blank in a jury's mind until somebody else testifies about it. And she can testify as to what he actually gave her.

MR. WENKE: I understand.

THE COURT: But not -- she can't say why or anything like that.

(Id., PAGEID # 299-300).  Therefore, the trial transcript demonstrates that counsel for Petitioner did object and argue that certain statements by Lauren Cope and Barbara Harper were hearsay and irrelevant.  However, the Court rejected these arguments.

In a similar fashion, counsel for Petitioner objected several times during the direct examination of Joseph Harper by the Government:

Q. I want to jump ahead to 2009.

A. Okay.

Q. At that time, did you talk to David about what had happened in West Virginia?

A. I did, yeah.

Q. And could you describe David's demeanor when he told you what happened?

A. He was absolutely devastated. I mean, he was in, I think, as bad of a mental condition as you would expect someone to be in those circumstances.

MR. WENKE: Objection.

THE COURT: Sir, if you could, rather than testify to conclusions, just testify as to what you saw. Okay? Are you with me?

THE WITNESS: Yes, Your Honor.

Q. Again, just how did he behave?

A. I mean, he was upset. I recall him crying when explaining what had happened. He was clearly a mixture of all sorts of emotions. He seemed –

MR. WENKE: Objection.

THE COURT: No, this is okay as long as you keep -- focus your testimony on what you saw. Keep going.

THE WITNESS: Okay.

A. He seemed, you know, he just seemed upset. He seemed depressed. He seemed on edge. I mean, I think it was -- that's how he seemed.

(Doc. 61, PAGEID #383).

Petitioner argues that the testimony of David Harper compounded the misuse of the hearsay testimony of Lauren Cope, Barbara Harper, and Joseph Harper. However, at that stage in the proceedings, the Court had already ruled that the statements were not hearsay or in response to objections by Petitioner's counsel, had excluded testimony which included out-of-court statements by David Harper. When determining whether counsel's performance was deficient, "reviewing courts must take care to avoid 'second-guessing' strategic decisions that failed to bear fruit." *Lundgren v. Mitchell*, 440 F.3d 754, 769-770 (6th Cir. 2006) (quoting *Strickland*, 466 U.S. at 689). Counsel for Petitioner attempted—both through a motion in limine and numerous objections during trial—to prevent Lauren Cope, Barbara Harper, and Joseph Harper from testifying about the first time David Harper revealed to them the allegations against Petitioner. While

11

counsel was successful in having hearsay testimony excluded, the Court rejected counsel's argument that the witnesses could not describe their observations.  Therefore, under the first prong of *Strickland*'s two-part test, Petitioner has not established that the performance of his counsel "fell below an objective standard of reasonableness" for failing to object to the testimony of Lauren Cope, Barbara Harper, and Joseph Harper.

### 2. **Testimony of Karen Fredette**

Petitioner explains that his counsel failed to object when the prosecutor mischaracterized testimony of Karen Fredette during redirect examination.

Petitioner explains that the only witness who recalled seeing David Harper while he was on the trip to West Virginia with Petitioner was Karen Fredette.  On direct examination by the Government, Karen Fredette testified that she met Petitioner in the Holy Redeemer Church when he arrived to cover mass for Paul Fredette.  (Doc. 61, PAGEID # 439-440).  Karen Fredette was then asked:

Q. At any time did you notice a boy?

A. I noticed a boy sitting alone in the nave of the church about halfway back as I came out of the sacristy. I would be facing the nave as I walked out the sacristy door.

Q. When you noticed the boy, was that before or after you had had your conversation with the defendant?

A. After.

Q. And was the boy with anyone?

A. He was alone.  I –

Q. Why does the boy stick out to you?

A. It's a small parish. It was a boy sitting alone that I did not recognize, and I believe I would have recognized most of the children in the parish, and this boy was unfamiliar to me.

Q. Did you note anything about his appearance?

A. He was -- **he looked tired or even sad.** He seemed to be just slumped a bit in the seat.

(Id. at 443-44) (emphasis added).    Petitioner argues that the Government misstated Fredette's statement twice on redirect examination without objection from Petitioner's counsel:

Q. Is the same boy that you saw sitting alone by himself **who you say was sad and tired**, is that the same boy that was introduced by the defendant?

A. Yes.

 . . .

Q. This little boy that you saw in the church sitting alone **who was sad and tired** and was introduced by the defendant, had you ever seen him prior to August 4th of 1991?

A. No.

(Id. at 466) (emphasis added).    Petitioner explains that his counsel then went on to mistakenly argue in his closing argument that Karen Fredette said that "He looked sad," which emphasized the mischaracterization of Fredette's testimony.   (See Doc. 68, PAGEID #778).   Petitioner argues that this testimony was important because a boy being sad would be consistent with a boy who had been sexually assaulted.

The Court finds that it was reasonable for Petitioner's counsel to refrain from objecting to this slight mischaracterization of Karen Fredette's testimony.   The Court cannot discern a material difference between the phrase "he looked tired or even sad" and a "boy  . . . who was sad and tired."   Moreover, Petitioner has not demonstrated how under the "prejudice" prong, "that there is a reasonable probability that, but for

counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Therefore, Petitioner has not established that counsel's failure to object to the prosecutor's mischaracterization of Karen Fredette's testimony entitles him to relief under either prong of *Strickland*'s two-part test.

### 3. Testimony of Larry Handorf

Petitioner argues that twice during the trial, the Government sought to make his counsel, Stephen Wenke, a percipient witness, but counsel failed to object.

Petitioner explains that the first occasion was during the testimony of Larry Handorf. In 2009, Handorf was hired by the mission where Petitioner was based in 1991 to investigate the allegations of sexual abuse David Harper was making against Petitioner. (Doc. 62, PAGEID #492). Handorf testified that his interview of Petitioner took place at Wenke's office and Wenke was present during the interview. (Doc. 62, PAGEID #492-93). Handorf testified that "[i]t was not a really productive interview. Most of the interview consisted of about an hour and a half with small talk. Every time I asked a question of Bob Poandl, his attorney would interject something, but we did conduct an interview." (Doc. 62, PAGEID #493). Petitioner argues that Handorf's testimony amounted to charging Wenke with obstruction of the investigation, and made him a percipient witness to the interview. Petitioner explains that counsel did not object to the testimony and it was repeated by the Government in closing argument.

Petitioner explains that counsel also failed to object on the second occasion, which was during the testimony of Douglas B. Iwold, a Green Township police officer who stopped David Harper's car in 2009 and found Harper in possession of marijuana.

Petitioner argues that the Government elicited testimony from Office Iwold which would

suggest that counsel had attempted to obstruct justice:

> Q. Okay. Have you spoken with Mr. Wenke, Steve Wenke, on the phone?
>
> A. Yes.
>
> Q. Have you ever met him before today?
>
> A. Years ago. I've been a policeman for approximately -- I'm in my twenty-third year. I do recall maybe meeting Mr. Wenke maybe years ago.
>
> Q. How about with regard to the time that you pulled over David Harper, do you remember when you first spoke with him about that?
>
> A. It was sometime after -- obviously after the stop, I mean, maybe within a year or so.
>
> Q. Did he tell you who he represented?
>
> A. No. I don't recall that. To the best of my knowledge, I thought I was speaking to a -- and this just very well can be my opinion, but I thought I was talking to a private investigator. I don't recall it being an attorney, per se, at the time.
>
> Q. Do you recall Mr. Wenke telling you that he was representing a man who was accused of sexually assaulting the person you were after about a weed ticket?
>
> MR. WENKE: Objection.
>
> THE COURT: Sustained.
>
> Q. Did he tell you he represented Robert Poandl?
>
> MR. WENKE: Objection. He's already answered.
>
> THE COURT: Well, do you remember the conversation, sir?
>
> THE WITNESS: The issue is, I've had many – not many. I've had several conversations with Mr. Wenke since, I guess, maybe 2010 at different times. I recall this was something that maybe in a different state at one point, and that was several years ago. I remember I was supposed to get a subpoena, but I never did. I was just under impression this was some sort of a civil case.

> There is nothing really of any importance because, being a police officer, I don't -- unless I'm investigating a case or I'm prepared to make a plea arrangement, I typically don't speak to defense attorneys. There is no reason to. So I -- if I did speak to him, I just wasn't under the impression that this was as important as it was.

(Doc. 62, PAGEID # 577-87). Petitioner argues that this testimony was prejudicial because the Government used the testimony to suggest that a defense lawyer would not be attempting to obstruct justice of his client were innocent.

While Petitioner maintains that his counsel should have objected this testimony, Petitioner does not provide any basis for an objection. While it may have been prejudicial—in terms of its evidentiary value—that does not mean that it was inadmissible evidence. As the Sixth Circuit has explained: "[i]f evidence admitted without objection was admissible, then the complained of action fails both prongs of the *Strickland* test." *United States v. Dado*, 759 F.3d 550, 565 (6th Cir. 2014) (quoting *Hough v. Anderson*, 272 F.3d 878, 898 (7th Cir. 2001)). Therefore, Petitioner has not established that counsel's failure to object during the testimony of Larry Handorf or Officer Iwold entitles him to relief under *Strickland*'s two-part test.

### B. Failure to object during closing argument

Petitioner cites a large portion of the dissenting opinion from the direct appeal of his conviction. The dissenting opinion includes a discussion of the remarks of the prosecutor during closing argument which referenced other boys and the need to protect other children. *United States v. Poandl*, 612 F. App'x at 371. The dissenting opinion also includes a discussion of the prosecutor's statements which asked the jury to put themselves in David Harper's position as a ten-year old boy, which the dissent

found to be a violation of the "golden rule." *Id.* at 372. The dissenting opinion concluded that the remarks were grounds for reversal. *Id.* at 373.

The majority opinion addressed these same remarks. In the majority opinion, the Sixth Circuit explained that in determining whether prosecutorial misconduct occurred, it employs a two-step analysis: "First, we determine whether the statements were improper." *Id.* at 365 (quoting *United States v. Boyd*, 640 F.3d 657, 669 (6th Cir. 2011)). "Second, we ask whether the remarks were so flagrant as to warrant reversal." *Id.* The court concluded that the prosecutor's comments were not flagrant. *Id.* at 366-67. The court then explained:

> If a comment is determined not to be flagrant, we will reverse only when: "(1) the proof against the defendant was not overwhelming; (2) opposing counsel objected to the conduct; and (3) the district court failed to give a curative instruction." *Johnson*, 525 F.3d at 485. Poandl admits that he did not object to any of the statements he challenges. His argument that his conviction must be reversed because it was premised on prosecutorial misconduct therefore fails.

*Id.* at 367. Petitioner argues that counsel should have objected to the statements, and that the failure to object led to the majority's holding that it could not reverse Petitioner's conviction based on these same comments.

The Sixth Circuit has explained that under *Strickland*, a failure to object to a prosecutor's comments does not fall below an objective standard of reasonableness unless the comments constituted prosecutorial misconduct. *Reed v. United States*, 133 F. App'x 204, 208 (6th Cir. 2005) (citing *Cook v. Stegall*, 56 F.Supp.2d 788, 794 (E.D.Mich. 1999) ("Having found no [prosecutorial misconduct], we fail to see how defense counsel's failure to object was either deficient or prejudicial to the defendant's case.")); *Donaldson v. United States*, 379 F. App'x 492, 493 (6th Cir. 2010) ("As we

have already rejected Donaldson's contention that his trial was marred by prosecutorial misconduct, Donaldson cannot demonstrate that his counsel's failure to object to the prosecution's actions in any way prejudiced his defense, and so cannot meet the second *Strickland* prong.").

However, even assuming, arguendo, that counsel's performance was deficient for failing to object, the Court finds that Petitioner is not able to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052.

Petitioner is only entitled to habeas relief if the statements were "so flagrant as to render the entire trial fundamentally unfair." *Reed*, 133 F. App'x at 210 (quoting *Hicks v. Collins*, 384 F.3d 204, 219 (6th Cir. 2004)). Four factors are considered in this determination: "(1) the likelihood that the remarks would mislead the jury or prejudice the accused; (2) whether the remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally presented to the jury; and (4) whether other evidence against the defendant was substantial." *Id.*

As the dissent in Petitioner's direct appeal explained, cases involving sexual abuse "typically turn on the relative credibilities of the defendant and the prosecuting witness." 612 F. App'x at 369 (quoting *Martin v. Parker*, 11 F.3d 613, 616-17 (6th Cir. 1993)).[1] The dissent also explained: "Given that Poandl challenged Harper's credibility extensively throughout trial, it was proper for the government to address David Harper's credibility and motivation." *Id.* at 371. However, the dissent noted that the prosecutor's

---

[1] The Court refers to the dissenting opinion heavily in its discussion of this issue because Petitioner did not provide much in the way of independent argument, but instead included a quote which contains almost the entire dissenting opinion in the section of his Motion addressing this argument. As such, the Court assumes Petitioner is adopting the points made by the dissenting opinion as his own.

comments about other children were not limited to discussions about David Harper's credibility, but "were part of a broader argument about Poandl's alleged custom of bringing boys on trips and the insinuation that he abused them, as well." *Id*.  However, the Court notes that it was Petitioner himself who admitted during his interview with the investigator Larry Handorf that he took boys on trips out of state.  During trial, Handorf was asked by the Government:

> . . . Okay. Did you ask him about taking boys on trips out of state?

> MR. WENKE: Objection.

> THE COURT: Basis.

> MR. WENKE: Relevance.

> THE COURT: Overruled.

> THE WITNESS: Oh, overruled. I'm sorry.

> THE COURT: You can answer the question if you remember.

> A. Yes, I did.

> Q. And what was his response?

> A. They would help him stay awake, and they would have a Catholic experience.

> Q. So he would take boys out of state with him?

> A. Yes.

(Doc. 62, PAGEID #495-96).  More importantly, Petitioner admitted to Handorf that he took David Harper on a trip:

> Q. Now, did you have a chance to ask Father Poandl about taking David Harper to or out of state?

> A. Yes, sir, I did.

Q. And what was his response?

A. That he vaguely remembered taking David somewhere out of state, but didn't think it was Spencer, West Virginia.

(Doc. 62, PAGEID #494).

David Harper himself does not remember every detail of that trip. At trial, Petitioner's counsel attempted to undermine David Harper's credibility by demonstrating that his memory of the trip was faulty. Evidence was presented showing that there were inconsistencies in David Harper's testimony about the day on which the trip may have occurred, the time of day he left on the trip, and the weather during the evening of the trip. In her closing argument, the prosecutor recounted this evidence, including evidence presented by Petitioner's counsel that the church in Spencer had undergone renovations after 1991, which called into question David Harper's recollection of the interior of the church.[2] This led to the comment in closing argument by the prosecutor which the dissenting opinion in Petitioner's direct appeal found improper and flagrant:

And do you remember David saying that The Holy Redeemer Church as he saw it in 2009 was 100 percent the same? Because he didn't.[3]

---

[2]David Harper also testified that he had not been inside the rectory next to the Holy Redeemer Church since he spent the night there in 1991. (Doc. 62, PAGEID # 509). Later, in 2012, David Harper drew a layout of the bedroom where the alleged sexual assault occurred. (Id. at PAGEID #510). During the testimony of Paul Fredette, photos of the bedroom were introduced which matched the drawing of David Harper. (Doc. 61, PAGEID # 406).

[3]On cross-examination David Harper was asked by Petitioner's attorney about the time in 2009 when he went back to the Holy Redeemer Church:

Q. Okay. And you looked around the church; right?

A. I did look -- I looked at the house from the outside, but we did walk through the church and it was exactly as I remembered it.

Q. That's what I was getting to. You said to the officer it was exactly as you described it, it was basically 100 percent certain that that was the exact same church.

This church that evidently went from looking like a bowling alley that you would not recognize at all, according to Paul Fredette, who the last time he stepped foot in that place was in 1992, said it was substantially the same.[4]

And think about when you were ten. What stuck out to you if you were somewhere? Would it be whether or not a wall was ten feet this way or

---

A. I am a hundred percent certain that is the exact same church, because he raped me.

(Doc. 62, PAGEID #549).

[4]Paul Fredette testified:

Q. So with regards to the cross, that was there in 1991?

A. Yes, sir, it was.

Q. And you say the window was not?

A. That is correct.

Q. The rafters the same?

A. The rafters are the same. The decorations that appear to be paintings or something like that, those were not there.

Q. Okay. The organ was roughly in the same place?

A. That is correct, sir.

Q. And you said there were some changes to the altar. Has that been moved?

A. Well, like I said, the whole wall has been pushed back. So the sanctuary -- but the actual arrangement of the sanctuary isn't much different, but the actual furnishings, I don't – I can't recall. I don't think they are the exact same ones that were there.

Q. But it looked substantially the same as you remember it in 1991?

A. Yes, looks substantially.

Q. Including the Christ on the cross?

A. Yes. The crucifix is the same one.

(Doc. 61, PAGEID # 422-23).

five feet that way, or would it be the exact same crucifix that had been there when you saw it as a child and the rafters that stuck out?

More importantly, would it be the room that you were raped in? Would that be what you remember?

Would the fact that a grown man who your mother and your father taught you to trust and taught you to obey, would you remember those details?

(Doc. 68, PAGEID # 805-806).

While David Harper may have been inconsistent on some minor details, David Harper's credibility was not questioned on two important details. First, he remembered going on a trip into another state with a priest. Second, he remembers being sexually assaulted by the priest while he was on that trip. Because David Harper was the only one who testified about the sexual assault, his credibility about the sexual assault was based on his testimony and demeanor while testifying. However, when it came to remembering the trip and the priest, he was not alone.

As recounted above, Petitioner himself admitted to Handorf that he "vaguely remembered taking David somewhere out of state." (Doc. 62, PAGEID #494).

Karen Fredette remembers Petitioner bringing a boy with him when he covered the mass at the Holy Redeemer church. (Doc. 61, PAGEID # 443). Karen Fredette recorded the visit from Petitioner in the church's bulletin, dated August 4, 1991: "A hearty welcome to Father Robert 'Bob' Poandle from Glenmary headquarters who will be celebrating Sunday liturgy with us today. Many thanks for coming, Father." (Doc. 61, PAGEID # 439). Fredette remembers Petitioner acknowledging the boy who was with him during his homily and asking the church to "give him a round of applause, be grateful to him for having traveled with Father to the parish during the night to keep him awake." (Id. at PAGEID # 444).

22

In addition, David Harper's brother, Joseph Harper, recalled Petitioner coming to their house looking for someone to go on an overnight trip with him. (Doc. 61, PAGEID # 375-76). Joseph refused to go, but he remembers David going instead because he "was younger and, I think, a little more agreeable." (Doc. 61 at PAGEID # 375). Joseph does not remember the time of day when David left or returned. (Id. at PAGEID # 375). Instead, Joseph testified:

> but I do recall, because I was, you know, I was a 13-year-old boy, I remember asking him if he had a good time. And my motivation for doing that was that I was his older brother, and I wanted to make sure that he had a bad time and he didn't enjoy himself. I would have been jealous if he had a wonderful trip and great time in West Virginia.

(Id.)

Finally, David Harper's mother remembered Petitioner taking David on a trip. Petitioner was not a stranger to the Harper family. Barbara Harper explained that they knew Petitioner though Worldwide Marriage Encounter, which was a Catholic organization in which married couples shared information about their "marriage, about communication, finances, our spirituality, our sexuality." (Doc. 60, PAGEID #269). This sharing would take the form of a "trialogue" with Petitioner in which Barbara Harper and her husband would share their feelings in love letters to each other, which were in turn shared with Petitioner. (Id. at PAGEID #270). Barbara Harper testified that Petitioner often came into their home, and when her husband lost his job, Petitioner gave them $800. (Id. at PAGEID #275, 278-79). Barbara Harper recalls that not long after Petitioner gave them the money, Petitioner came to the house asking if one of the boys could accompany him on a trip to West Virginia to help keep him awake. (Id. at PAGEID #280-81). Barbara Harper recalls asking David to go:

23

> . . . I asked Dave to go, and he said no. He said he didn't want to go. And I said, I said, "Father Bob has been so good to us, you know. Please go with him. It'll be okay, Dave. You'll be home tomorrow, and everything will be all right."

(Id. at PAGEID #283). Barbara Harper recalls that David then "went up and packed a little bag, and I walked him out to the car and gave him a hug. Joe walked out with us too, put him in the car." (Id. at PAGEID #284). Barbara Harper specifically testified that she trusted Petitioner to take David on the trip to West Virginia:

> . . . Did you receive a phone call later that evening saying they made it safely?
>
> A. No. But, you know, I didn't expect one. I mean, he told me they were going to get in late, and I trusted him. I thought he was in great care, so I didn't expect one. Nobody had cell phones.

(Doc. 60, PAGEID # 285).

Barbara Harper explained that when Petitioner returned with David the next day, they came into the house:

> . . . Initially, Bob was talking to my husband in the living room, and I know I was with David alone in the kitchen. I – he didn't look well, and I asked him, I said, "Well, you know, what's wrong? Is your stomach upset or something?"
>
> And he said, "Yeah." He said, "He gave me cornflakes with lemonade on it for breakfast."
>
> And, you know, I mean, as a mother, I'm thinking: You give him cornflakes and you give lemonade. You don't put it on the cereal.
>
> But that was my thought. He said he didn't feel good. I thought: Well, I can understand you don't feel good.
>
> You know, I asked him -- he looked tired. I said, you know, "Did you sleep well?" And he said, "No, I didn't sleep well."
>
> And he was standing by the hallway by our refrigerator. We had an old Cape Cod house, and you could go from the hallway to the living room to the dining room to the kitchen. And only Dave and I were in the kitchen.

He was standing by the refrigerator door almost at the hallway to go out, and he asked me if he ever had to go with Father Bob again. And I told him no, that he did not have to go with him again. And then he ran upstairs.

(Id. at PAGEID #286-87).

The Court concludes that even if Petitioner was able to establish his counsel's failure to object to the prosecutor's remarks in closing arguments "fell below an objective standard of reasonableness," the record does not establish that but for counsel's unprofessional errors, the result of the proceeding would have been different. For the most part, the prosecutor's remarks identified by Petitioner were based on testimony in the record. Therefore, the likelihood that these remarks would mislead the jury or prejudice the accused was low. The majority opinion in Petitioner's direct appeal found that the prosecutor's remark which asked the jury "to show the same courage" as David Harper "blurs the line between connecting the point to the victim and asking the jury to identify with the victim." 612 Fed. Appx. at 366. However, the court found the remark was isolated. 612 Fed. Appx. at 366.

Moreover, putting the comments of the prosecutor aside, the other evidence against Petitioner was substantial. Petitioner did not present any evidence which would question David Harper's memories of the sexual assault. Therefore, his credibility as to those events depended upon what the jurors saw when he testified: what words he used, the emotion in his voice, and the hand gestures he used in re-telling what happened. Petitioner did not question that testimony at trial. Instead, Petitioner questioned David Harper's memory of the trip he took out of state with Petitioner. While there was evidence that he did not remember every detail of the trip correctly, there was substantial evidence that Petitioner took him on the trip. Petitioner himself recalls taking

David Harper on a trip and explained that he had a practice of taking boys on trips to help him stay awake.  Karen Fredette remembers Petitioner bringing a boy with him to the Holy Redeemer Church, and asking the church during his homily to "be grateful to him for having traveled with Father to the parish during the night to keep him awake."  In addition, Joseph Harper remembers David going on the trip with Petitioner.  Finally, Barbara Harper remembers pleading with David to go on the trip with Petitioner because Petitioner had "been so good to us."  Barbara Harper also remembered David returning from that trip, not feeling well, looking tired, and asking if he ever had to go with Petitioner again.  Therefore, the Court concludes that even assuming, *arguendo*, that counsel's performance was deficient under the first part of *Strickland*'s two-part test, under the second part of the test, there is not a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

**C.  Failure to impeach witnesses**

**1.  Karen Fredette**

Petitioner argues that his counsel was ineffective because he failed to impeach Karen Fredette for bias despite being on notice that she had become hostile to Petitioner.  Petitioner relies on the Declaration of Anita Harold Ashley, who represented Petitioner in an earlier, related criminal proceeding in state court in West Virginia.  (Doc. 106-2).  Ashley explains that she and her co-counsel notified Petitioner's counsel in the federal proceedings, Stephen Wenke, that Karen Fredette "appeared to be hostile" towards them because they had successfully moved to compel Fredette to produce her diaries in preparation for trial.  (Ashley Decl., PAGEID #: 1396).  Petitioner claims that this resulted in Karen Fredette having strong bias against him.  Ashley explains she and

her co-counsel informed Wenke of the strategy they had formulated "to deal with [Fredette's] cross-examination, focusing primarily on her anger at the mandatory disclosure and her statement to Sgt. Swiger that she could not remember whether any child accompanied Poandl to West Virginia and that she could not go on the witness stand to swear that a child had been here." (Ashley Decl., PAGEID #1396). Petitioner explains that despite this advice, his counsel never explored this bias during the federal trial.

However, counsel did extensively cross-examine Fredette, questioning her memory about Petitioner's visit and whether he brought a boy with him. For example, on cross-examination, counsel for Petitioner asked:

> Q. When you were first contacted about this case back in 2009, you could not remember Bob Poendl [sic] coming?

> A. No. I had been away.  This was about 18 years, and it was a name of someone I met once.  I didn't recall it until I saw it in my journal.

(Doc. 61, PAGEID #449).  Counsel for Petitioner also asked:

> Q. You said -- actually, I want to go back. When you were first contacted, you said you could not get up on the stand and testify that Father Poandl had brought a boy with him.

> A. At that time, I couldn't. But when I -- I did remember that a priest had brought a child with him, and which priest it was -- when I realized the three priests in question would have been Father Jim DuPont, Father Jim Kelly or Father Bob Poandl, I knew it was neither of the first, neither of Father Jim nor Father DuPont.

> Q. I actually think you had said to the F.B.I. that the reason you knew that Father Poandl had brought him is you went back through your diary and you saw that Jim Kelly and Jim DuPont both did not have any mention of a boy. You used your diary --

> A. Yes.

27

Q. Okay. So by that process of elimination, by not having it written in the diary that they had brought a boy, that's where you landed on Father Poandl.

A. No. I knew these priests well, and I would have remembered if either of them had brought a boy. The only priest who brought a boy was Father Poandl.

(Doc. 61, PAGEID # 452-53).

The Court concludes that counsel's questioning falls within "the wide range of reasonable professional assistance." *Strickland*, 466 U.S at 689. Under the circumstances, choosing to avoid asking Fredette questions about being compelled to produce her diaries "might be considered sound trial strategy." *Id.* As a practical matter, the Court had ruled that the parties were not permitted to mention the West Virginia proceedings. (Doc. 66, PAGEID #664). That very issue came up at a sidebar conference with the Court during the cross-examination of Karen Fredette. (Doc. 61, PAGEID #460). Ashley, who represented Petitioner in the West Virginia proceedings, did not have the same constraints, and perhaps it would have been sound trial strategy in those proceedings to attempt to show Fredette's bias. Moreover, as the Supreme Court has recognized: "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland*, 466 U.S at 689. Therefore, Petitioner has not established that counsel's failure to attempt to impeach Karen Fredette for bias entitles him to relief under *Strickland*.

## 2. **David Harper**

Petitioner claims that counsel was ineffective for failing to impeach David Harper with evidence the Harper had attempted to obstruct justice. Petitioner explains that his

counsel was aware that the criminal proceeding against him in West Virginia was dismissed because of misconduct by David Harper with respect to document production. However, the Court notes that Petitioner quotes and relies upon a finding of the West Virginia court's order which was later withdrawn by the court. (See Doc. 106-2, PAGEID # 1414) ("The affidavit of Nicole M. Roesel (STATE'S EXHIBIT A) reveals that it was Ms. Roesel and not David Harper who deleted certain records from Family Medical Group. To the extent that the Court found in paragraph 12 of the findings of fact that David Harper deleted records which he did not wish to disclose from Family Medical Group, such finding is in error."). Moreover, as explained above, the Court had already prohibited the parties from mentioning the West Virginia proceedings. Therefore, Petitioner has not established that counsel's failure to attempt to impeach David Harper entitles him to relief under *Strickland*.

### D.  Failure to investigate

Petitioner explains that David Harper admitted at trial that he used marijuana and LSD in high school, that he used cocaine and marijuana in college, and that he was addicted to oxycodone until 2009, the year he first made allegations against Petitioner. Petitioner argues that a "cursory examination through an Internet search of the effects of LSD on a user would have revealed the possibility that David Harper invented his claim" against Petitioner. (Doc. 100-2, PAGEID #1358). Petitioner argues that counsel should have explored whether Harper's drug use "could have caused Harper to hallucinate and develop delusions about a rape that never occurred." (Id., PAGEID # 1359). Petitioner suggests that counsel should have elicited testimony about the effects of LSD and opioid use from Harper himself because he is a pharmacist. Failing that,

Petitioner argues that counsel should have presented an expert witness to testify about the possible significance of David Harper's drug use. Petitioner has presented the Declaration of Joe Maher, president of Opus Bono Sacerdotii, which is an organization which has experience assisting priests who have been charged with sexual misconduct. (Doc. 106-3). Maher states that his organization offered to assist Petitioner and his counsel. (Id., PAGEID # 1433).

Counsel for Petitioner conducted an extensive cross-examination of David Harper, asking multiple questions about his drug use in an attempt to question his credibility. (Doc. 62, PAGEID # 539-548). Moreover, it would have been an unusual strategy to qualify David Harper, the victim of the crime, as an expert to impeach his own testimony. Therefore, Petitioner has not established that counsel's failure to attempt to investigate and question David Harper about the effects of his past drug use entitles him to relief under *Strickland*.

### E. Failure to enlist expert help

Petitioner maintains that his counsel should have sought expert assistance on issues related to jury selection, Petitioner's decision to testify, protecting jurors from prejudicial publicity, and the importance of presenting evidence to explain a motive for a false allegation. Petitioner argues that his counsel could have consulted with Opus Bono Sacerdotii. Petitioner also argues that his counsel could have used the jury questionnaire prepared by Ashley to screen jurors who had heard national publicity about scandals involving Catholic priests. (See Doc. 106-2, PAGEID # 1420). In her Declaration, Ashley explains that she provided Petitioner's counsel with a copy of the questionnaire. (Doc. 106-2, Ashley Decl., PAGEID #1397).

The Court notes that it is "all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland*, 466 U.S. at 689. Petitioner has not pointed to any specific errors on the part of counsel which could have been remedied through the use of an expert. While Petitioner has provided the Court with the questionnaire developed for use in the proceedings in West Virginia, this Court informed the parties in the Final Pretrial Conference that it permits wide latitude in *voir dire*:

> In terms of the jury selection itself, again, that's fairly wide open. I just try to get them talking by asking general questions on the usual topics. I also cover all of the hardship-type stuff myself so you guys don't have to ask those questions to them. I let you guys do pretty much what you want to do. (Doc. 91, PAGEID #1083).

> There's no time limitation on *voir dire* as long as you keep them interested. If they start getting bored, I'll let you know. Because if I'm bored, they're bored; right? Okay." (Doc. 91, PAGEID #1086).

As a result, it was reasonable for Petitioner's counsel to find the questionnaire unnecessary. Moreover, many of the questions on the questionnaire were asked of the panel. In addition to asking questions about scheduling or whether the potential jurors knew any of the parties, their attorneys, or the potential witnesses, this Court specifically addressed media attention:

> This particular case has had some media attention. There have been a couple of -- I think a couple of newspaper articles written. There may have been some things on television. I really don't know. But here's what I want to say about that. Okay?

> If anybody has seen anything about the case, I want you to understand that what you have seen about the case is not allowed to influence your deliberations in the case.

(Doc. 81 SEALED, PAGEID #910).  The Court then provided a specific example.  (Doc. 81, SEALED, PAGEID #911).  In its questioning, the Government asked whether anyone had heard Petitioner's name in a media report.  (Doc. 81, SEALED, PAGEID # 929).  The Government also asked if anyone had heard news reports of "abuse in the Catholic Church" and whether that would prevent them from being fair and impartial.  (Doc. 81, SEALED, PAGEID #954).  The Government also asked whether any one on the panel knew someone who has been a victim of a sexual assault.  (Doc. 81, SEALED, PAGEID #955).  Counsel for Petitioner followed up and asked whether anyone would test credibility differently because there is an accusation of sexual abuse.  (Doc. 81, SEALED, PAGEID #971-72).  Counsel also questioned the potential jurors whether they could not be fair because they would be "emotionally driven one way or the other."  (Doc. 81, SEALED, PAGEID #977).  Petitioner has not identified any specific questions which counsel should have asked, or what prejudice the omitted questions caused.  Therefore, Petitioner has not established that counsel's failure to use an expert such as Opus Bono Sacerdotii or the jury questionnaire prepared by his West Virginia counsel entitles him to relief under *Strickland*.

### F.  Failure to monitor publicity

Petitioner claims that his counsel did not monitor publicity during trial and did not ask the Court to assure that jurors were not exposed to it.  The Court notes that during voir dire, the Court told the potential jurors: "if during the course of the case there's an article or a report or anything like that and you see it coming, just tune it out, ignore it, leave the room, turn off the television, don't read that article in the paper."  (Doc. 81, SEALED, PAGEID #915-16).  Moreover, the Court gave a similar instruction to the

jurors throughout the trial. (See, e.g., Doc. 62, PAGIED # 580). Therefore, it was not unreasonable for counsel for Petitioner to refrain from making an additional request to address media attention with the jurors. Petitioner is not entitled to relief under *Strickland* on this basis.

### G. **Failure to adequately advise**

In his Declaration, Petitioner claims that counsel failed to adequately inform him of either the strengths or the risks of testifying on his own behalf, or the circumstances under which the Government might offer evidence under Federal Rule of Evidence 414. (Doc. 106-1).

Before trial, the Government filed a Notice of Intent to Introduce Evidence of Defendant's prior Child Molestation Offenses pursuant to Federal Rule of Evidence 414 for Limited Purposes. (Doc. 39). Petitioner was informed that there were allegations that Petitioner sexually abused two other boys in 1981 and 1984. (Id.) This issue was raised again by the Government on the first day of trial. (Doc. 66, PAGEID # 664-66). The Government stated that it did not intend to seek to use the Rule 414 evidence in its case-in-chief, but "if certain evidence is elicited or testimony is elicited that goes to the character of the defendant or that these allegations do not exist, that we would introduce it for the purposes of rebuttal, cross-examination or some other purpose." (Doc. 66, PAGEID # 664).

Petitioner claims that counsel never explained the meaning of the prosecutor's statement to him. Petitioner also states that counsel failed to seek a ruling from the Court as to whether the Court would admit any Rule 414 evidence if Petitioner testified and simply denied David Harper's charge. Petitioner also argues that counsel failed to

investigate the background of Jeffrey Allen Hutchison, who the government presented as one of the two additional victims of sexual abuse by Petitioner and a potential witness under Federal Rule of Evidence 414.

The Sixth Circuit has held that it is not objectively unreasonable for counsel to make a strategic decision to advise the defendant not to testify because counsel predicted that the value of his testimony would be outweighed by the damage of impeachment testimony. *Goldy v. Tierney*, 345 F. App'x 169, 173 (6th Cir. 2009). The court reached this conclusion even though the trial court had not ruled on the admissibility of the impeachment evidence. *Id.* The court explained there was a reasonable probability that the court would not admit the evidence, but there was also a reasonable probability that the court would admit the evidence. *Id.* The court explained that under the circumstances, "[c]ounsel's strategy choice was well within the range of professionally reasonable judgments," *Strickland*, 466 U.S. at 699, 104 S.Ct. 2052, and [the petitioner] has not overcome the presumption that his attorney's decision was sound trial strategy." *Id.*

Here, there was a reasonable probability that the Court would have permitted the introduction of the evidence of the allegations of the two other victims. Rule 414 provides: "In a criminal case in which a defendant is accused of child molestation, the court may admit evidence that the defendant committed any other child molestation." Fed. R. Evid. R. 414(a). As the Sixth Circuit has explained:

> Rule 414(a) reflects congressional recognition that prior acts of sexual misconduct involving children, including possession of child pornography, are probative to show an offender's propensity for committing a similar charged offense. The greater the similarity of the prior acts to the charged offense, the greater the probative value.

*United States v. Trepanier*, 576 F. App'x 531, 534 (6th Cir. 2014) (citing *United States v. Seymour*, 468 F.3d 378, 385 (6th Cir. 2006)).

The Government explained in its Rule 414 Notice:

At trial, the United States may seek to introduce evidence of defendant's sexual molestation involving two approximately ten year old boys over a time period beginning in approximately May, 1981 through May, 1984. Specifically, in 1981, defendant caused Minor Child 2, a male child approximately 10-12 years of age, to undress. The defendant fondled the child's genitalia while the child was in the bathtub. Additionally, in or prior to May, 1984, defendant caused Minor Child 3, a male child approximately 10-11 years of age, to become in a state of undress while the child slept. Upon waking, the child had been undressed by the defendant and the defendant was or had been performing oral sex on the child.

The defendant became aquatinted with the parents of Minor Child 2 and 3, in addition to DH (the child subject of the instant offense) through his participation in Worldwide Marriage Encounters. Marriage Encounters is a program affiliated with the Catholic Church. The defendant is a priest with Glenmary Home Missioners, located in Fairfield, Ohio. The defendant, in each instance of alleged molestation, asked the parents' permission for their sons to spend the night with him. Each of the instances of molestation took place in the rectory of a church and/or a church itself.

(Doc. 39). The Court finds that based on the similarity of these acts, the Court finds it reasonable for counsel for Petitioner to make a strategic decision to advise the defendant not to testify.[5] The value of Petitioner's testimony would be outweighed by the damage caused by this evidence. Therefore, Petitioner has not shown that he is entitled to relief under *Strickland* on this basis.

---

[5]The Court notes that before the commencement of trial, counsel for Petitioner did question the retroactive application of Rule 414. (See Doc. 66, PAGEID # 665). However, courts have "rejected similar *ex post facto* challenges to the retrospective application of new laws that permit the introduction of evidence of prior sexual misconduct to establish the offender's propensity to commit the charged offense, on the ground that such laws do not lower the quantum of evidence or burden of proof required to sustain a sexual misconduct conviction." *See Miracle v. Haas*, No. 2:15-CV-10562, 2016 WL 1583807, at *5 (E.D. Mich. Apr. 20, 2016) (collecting cases).

### H.  Failure to prepare for sentencing hearing

Petitioner argues that his counsel was not adequately prepared for the sentencing hearing.  At the sentencing hearing, the Government introduced the testimony of Jeffrey Allen Hutchison, who alleged that he was sexually abused by Petitioner.  Petitioner points out that counsel did not investigate Hutchison and had not spoken to Petitioner about Hutchison's allegations, and therefore his counsel was unprepared to cross-examine Hutchison at the sentencing hearing.  Petitioner argues that as a result he was denied ineffective assistance of counsel at sentencing, and the inadequate performance of counsel at sentencing corroborates his overall claim that he received ineffective assistance of counsel at trial.

However, even if counsel's lack of preparation was so deficient as to violate the Sixth Amendment under the first prong of the *Strickland* test, Petitioner has not demonstrated that this alleged deficiency prejudiced the outcome of the sentencing hearing.  At the most, the cross-examination of Hutchinson would have called into question the credibility of his testimony.  However, without more, even that outcome is based on speculation.  In addition, this Court is not persuaded that a lack of preparation at the sentencing hearing would establish that counsel's performance at trial fell below an objective standard of reasonableness.  Therefore, Petitioner has not shown that he is entitled to relief under *Strickland* on this basis.

### IV.  Conclusion

Pursuant to 28 U.S.C. § 2255(b), the Court determines that the motion and the files and records of the case conclusively show that Petitioner is not entitled to relief.  Therefore, a hearing is not necessary to determine the issues and make the findings of

fact and conclusions of law with respect thereto.  *Accord Smith v. United States*, 348 F.3d 545, 550-51 (6th Cir. 2003).  The claims raised are conclusively contradicted by the record and the law of the Sixth Circuit and the United States Supreme Court. Accordingly, Petitioner's Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence (Doc. 100) is hereby **DENIED**.

Further, the Court will not issue a certificate of appealability.  The Court concludes that none of the claims raised by Petitioner in his motion, which have been decided on the merits, are debatable among reasonable jurists, could be resolved differently on appeal or are adequate to deserve encouragement to proceed further. *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).  In addition, Petitioner has not made a substantial showing of the denial of a constitutional right.  *See* 28 U.S.C. § 2253(c); *see also* Fed. R. App. P. 22(b).

**IT IS SO ORDERED.**

_____*/s/ Michael R. Barrett*_____
MICHAEL R. BARRETT, Judge
United States District Court